IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

WAYNE L. WHEAT,

        Plaintiff,

    v.

CHASE BANK, JP MORGAN CHASE
BANK, N.A. et al.,

        Defendants.

:

:

:

:

Case No. 3:11-cv-309

JUDGE WALTER H. RICE

---

DECISION AND ENTRY SUSTAINING IN PART AND OVERRULING IN PART THE MOTION FOR SUMMARY JUDGMENT (DOC. #24) OF DEFENDANTS CHASE BANK, JP MORGAN CHASE BANK N.A., CHASE INVESTMENT SERVICES CORPORATION, AND MATTHEW COX; GRANTING SUMMARY JUDGMENT IN FAVOR OF ALL DEFENDANTS ON PLAINTIFF'S FEDERAL CLAIMS UNDER 42 U.S.C. § 1981 (COUNT ONE), 15 U.S.C. § 78j(b) (COUNT TWO), AND PLAINTIFF'S OHIO COMMON LAW CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (COUNT FIVE); GRANTING SUMMARY JUDGMENT IN FAVOR OF DEFENDANTS CHASE BANK, JP MORGAN CHASE BANK N.A. AND MATTHEW COX ON ALL CLAIMS; DISMISSING WITHOUT PREJUDICE TO REFILING IN A STATE COURT OF COMPETENT JURISDICTION PLAINTIFF'S CLAIMS FOR BREACH OF CONTRACT (COUNT THREE) AND CONVERSION (COUNT FOUR) AGAINST DEFENDANT CHASE INVESTMENT SERVICES CORPORATION; STRIKING ALL AMENDMENTS TO PLAINTIFF'S AMENDED COMPLAINT (DOC. #46), WITH THE EXCEPTION OF THE NAMING OF CHASE INVESTMENT SERVICES CORPORATION AS A DEFENDANT; OVERRULING PLAINTIFF'S REQUEST FOR ADDITIONAL DISCOVERY (DOC. #53), CONSTRUED AS A MOTION UNDER RULE 56(d) OF THE FEDERAL RULES OF CIVIL PROCEDURE; OVERRULING AS MOOT DEFENDANTS' MOTIONS IN LIMINE (DOC. #62, DOC. #63, DOC. #64, DOC. #65, & DOC. #66); JUDGMENT TO ENTER IN FAVOR OF DEFENDANT AND AGAINST PLAINTIFF; TERMINATION ENTRY

---

Wayne L. Wheat ("Wheat" or "Plaintiff") filed suit against Chase Bank, JP Morgan Chase Bank, N.A. ("Chase"), Chase Investment Services Corporation ("CISC"), CISC's employee Matthew Cox ("Cox"), and various unnamed Chase officers and employees (collectively, "Defendants") after Defendants closed his deposit and investment accounts. Wheat's federal claims allege that Defendants' actions violated the nondiscrimination provisions of 28 U.S.C. § 1981 and the prohibition on a manipulative or deceptive practice in connection with a securities transaction under 15 U.S.C. § 78j(b). Wheat also alleges state common law claims for breach of contract, conversion, and intentional infliction of emotional distress. Pursuant to 28 U.S.C. § 1331, the Court has original jurisdiction over Wheat's federal claims, and, pursuant to 28 U.S.C. § 1367, supplemental jurisdiction over his state law claims.

Pending before the Court is the Defendants' renewed Motion for Summary Judgment, originally filed on July 26, 2012. Doc. #24. For the reasons set forth below, the Court SUSTAINS in part and OVERRULES in part Defendants' motion.

## I.    FACTUAL & PROCEDURAL BACKGROUND

Plaintiff Wayne L. Wheat is an African-American businessman in Dayton, Ohio. Compl. ¶ 2 (Doc. #1 at 1). Joey Williams ("Williams"), the then President of Chase Bank in Dayton, an acquaintance of Wheat, is also an African-American. Williams Decl. ¶¶ 1-2, 6 (Doc. #24-1 at 1-2). As a result of Williams' referral in April of 2011, Plaintiff closed his accounts at another bank and deposited

2

approximately $450,000 at Chase. *Id.*; Doc. #1 at 2. Williams himself did not process the opening of the accounts, but, after meeting with Plaintiff, personally escorted him to an area of the bank where personnel were present to assist with opening them. Doc. #1 at 2; Doc. #4 at 2.

### A. Plaintiff's Checking and Savings Accounts at Chase

Plaintiff opened a "Chase Plus Savings" account and a "Chase Premier Platinum Checking" account. Gross Decl. ¶ 3, Ex. 1-2 (Doc. #24-2 at 1, 3-4). Plaintiff signed a "Personal Signature Card" for both accounts, each of which contained the following language:

> I acknowledge receipt of the Bank's *Account Rules and Regulations* or other applicable account agreement, which includes all provisions that apply to this deposit account and the Bank Privacy Policy, and agree to be bound by the terms and conditions contained therein as amended from time to time.

Doc. #24-2 at 3-4; Doc. #1 at 2.

Chase's Account Rules and Regulations, in a section captioned "Closing Your Account," states the following:

> Either you or the Bank may close your Account at any time with or without cause. . . . If we close your Account, we may send you written notice that the Account is closed on the date we close your Account. We will return the balance in your Account less any fees or service charges, claims, setoffs or other amounts you owe us, if such net amount exceeds one dollar.

Doc. #24-2 at 25.

Under the caption "Authorization to Share Information," the Account Rules and Regulations state the following: "You authorize us to share information about

3

you and your Account with affiliates and third parties, as permitted by applicable federal and state laws." *Id.* at 28.  In addition, the Account Rules and Regulations include a four page section disclosing how Chase shares customer information. *Id.* at 37-40.  Therein, "Affiliates" are defined as "[c]ompanies related by common ownership or control.  They can be financial and non[-]financial companies." *Id.* at 40.  The document states that "[t]he JPMorgan Chase & Co. family of companies" provides the notice, and that "[a] partial list of its U.S. consumer financial companies is located at the end of this document." *Id.* at 39.

### B. Plaintiff's Investment Account at Chase Investment Services Corp.

Chase Investment Services Corporation ("CISC") is a securities broker-dealer.  Cox Decl. ¶ 2 (Doc. #24-3).  CISC is a Chase affiliate and a member of the "family of companies" with which Chase shares customer information.  Doc. #24-2 at 41.  Fayah Nyumah, a Chase employee, referred Plaintiff's name to CISC as a potential investment customer.  Doc. #57 at 24-26.  On or about April 26, 2011, Plaintiff was contacted by John Lumpkin ("Lumpkin"), a CISC employee, about opening an investment account at CISC with a portion of the funds Plaintiff had deposited at Chase.[1]  Doc. #1 at 2; Doc. #24-3 at 1.  Lumpkin, an African-American, was the "responsible person" on Wheat's CISC investment account, and

---

[1] According to Lumpkin, he and Nyumah participated in an incentive program in which Chase bankers referred potential investment customers to CISC.  Doc. #57 at 24-26.

4

remained its "advisor" the entire time the account was open.  Doc. #4 at 2; Doc. #24-3 at 1.

Plaintiff brought $150,000 of the original $450,000 deposit to fund the CISC investment account.  Doc. #4 at 2.  According to Lumpkin, when Plaintiff came in to open the investment account, employees at Chase and CISC exhibited "strange" behavior.  Doc. #57 at 77-79.  While the account was being processed, bank personnel were "coming in and out" from a back office of the branch from which they almost never emerged.  *Id.*  In addition, Cox, who was Lumpkin's supervisor, "just showed up" and interrupted the meeting between Plaintiff and Lumpkin.  *Id.* at 78.  Lumpkin found Cox's behavior "strange" and "rude."  *Id.* at 78-79.

When he opened his investment account at CISC, Plaintiff signed a "Client Services Agreement."  Doc. #24-7.  In Section 9, the agreement stated the following:

> This Account is also subject to the terms and conditions of the CISC Disclosures and Brokerage Account Agreement (the "Brokerage Agreement"), including the provisions requiring and governing arbitration. Client acknowledges that Client has received a copy of the Brokerage Agreement. Client agrees that Client and the Account are bound by the terms of the Brokerage Agreement; except that where there is a conflict between the terms of this Agreement and the terms of the Brokerage Agreement, the terms of this Agreement shall govern the Account.

*Id.* at 6.

Section 7 of the Brokerage Agreement covers "Account Termination and Restriction," and states, inter alia, the following:

5

b. I understand that I may terminate or close my Account at any time. I agree that I will remain fully responsible for any charges to my CISC Account, whether arising before or after termination.

c. You have the right to terminate any of my Accounts . . . at any time and for any reason, upon notice to me. You have the right to terminate or restrict the service contemplated hereunder at any time upon notice to me. The provisions of this Agreement and the Account Documents shall survive the termination.

d. I understand that you may (whenever you or the Clearing Broker consider yourselves to be at risk for any reason with regards to my Account) freeze my Account in whole or in part, or close out any commitment made on my behalf, reject any trade, prohibit or restrict trading of securities or substitution of securities in my Account, or cancel any outstanding orders, all in your sole discretion, and without notice to me.

*Id.* at 16.

### C. Account Restriction and Termination

New account holders are subject to "identification and due diligence" by compliance officers at Chase and CISC. Massa Decl. ¶ 2 (Doc. #24-6). According to Yryjo "George" Massa, a Vice President and Compliance Manager at Chase, a "clearing firm" conducts an automated search on new and existing accountholders, using both the Internet and unnamed databases. Doc. #24-6 at 1. Based on the results of the search, "certain types of client relationship or transactional histories" may present a risk such that the compliance officers recommend terminating the relationship with the accountholder. *Id.*

After performing a search on Plaintiff, an automatic hold was placed on his CISC account that restricted its activity to outgoing cash transfers or liquidation.

6

*Id.* at 2. Massa was informed of the hold, and, "[b]ased on the content of the negative media associated with Mr. Wheat and the reputational risk to Chase," recommended that all of Plaintiff's accounts at Chase and CISC be closed. *Id.* Massa based his recommendation on reports of "a conviction of Mr. Wheat for money laundering and drug conspiracy and an investigation into the business practices of a funeral home owned by Mr. Wheat by an agency of the state of Ohio that regulates funeral homes." *Id.* Massa never met Plaintiff, nor did he have any contact with Williams or Lumpkin. *Id.* Massa is based in Iselin, New Jersey. *Id.* at 1. He was not aware that Wheat was African-American, and states that the "Compliance [Department] is not provided, and does not track or maintain, any information concerning the race or skin color of a customer." *Id.* at 2.

Steve Dahlke, a Vice President and Compliance Manager at CISC, received the recommendation from Massa to close Plaintiff's CISC account. Dahlke Decl. ¶¶ 1, 5 (Doc. #24-4 at 1-2). Dahlke is based in Columbus, Ohio, and, like Massa, has never met Plaintiff. Doc. #24-4 at 1-2. Dahlke had no "input from or contact with anyone who knew Mr. Wheat," including Lumpkin, and had no knowledge that Plaintiff was an African-American. *Id.* at 2. According to Dahlke, CISC only collects information on race or ethnicity if a customer is a nonresident alien. *Id.*

Valerie Mangan is the Assistant Vice President and Senior Compliance Officer for Consumer and Business Banking at Chase. Mangan Decl. ¶ 1 (Doc. #24-5). Like Dahlke, she received a recommendation from Massa to close Plaintiff's accounts. *Id.* Mangan is based in New York City, and has "final

7

authority in decisions to end client relationships" for Chase.  *Id.* at 1.  Mangan had

no knowledge of Plaintiff's race when she decided to terminate his accounts, and

only learned of it after he filed suit against Chase.  *Id.* at 2.  According to Mangan,

Chase does not collect information about an accountholder's race in connection

with a retail bank account.  *Id.*

On July 20, 2011, Chase sent Plaintiff a letter, stating that his accounts

would be "terminated and closed" on August 17, 2011.  Compl. Ex. A (Doc. #1-

1).  The letter, signed by "Chase Operating Loss Prevention," gave no reason for

the termination of Wheat's accounts.[2]

Wheat went to Chase's branch in downtown Dayton, Ohio, to close his

accounts and withdraw all of the funds they contained.  Chase did not allow

Wheat to withdraw the $150,000 in the investment account.

Defendant Matthew Cox is the Vice President of Investments at CISC in

Dayton.  Cox Decl. ¶ 1 (Doc. #24-3 at 1).  Cox was also Lumpkin's supervisor.

Doc. #24-3 at 1.  According to Cox, he explained to Wheat that CISC was unable

to return the $150,000 in Wheat's investment account at that time because it was

---

[2] After receiving the letter, Wheat alleges that he contacted Williams and Lumpkin
by phone, neither of whom knew why Chase was closing Wheat's accounts.  Doc.
#1 at 3.  Defendants admit that Plaintiff contacted Lumpkin "via phone and asked
about the cause of the termination."  Doc. #4 ¶ 10.  However, Lumpkin stated
that he did not know that Plaintiff's account had been "frozen" until Plaintiff "came
in and asked how his account was doing."  Doc. #57 at 38.  Lumpkin stated that
he "went to pull [the account] up and could not, so that's how I found out."  *Id.*
Although the manner in which Lumpkin found out that Plaintiff's accounts had
been frozen is not clear, whether he found out by phone or in person is not a fact
that is material to Plaintiff's case.

"following a process to reverse purchases and trades made in the account" in order to avoid a "taxable event." *Id.* at 2. That conversation occurred on August 12, 2011. On August 30, 2011, CISC issued Wheat a check for $150,000, the amount of the initial deposit into the investment account. *Id.*

### D. Procedural History

The same day that CISC issued the refund check, August 30, 2011, Plaintiff filed suit against Chase, Cox, and various unknown officers and employees of Chase, although he did not name CISC as a defendant. Doc. #1. The Complaint alleges five claims under federal and state law. First, Plaintiff alleges that the closure of his accounts and the failure to return the $150,000 in the investment account amounted to discrimination in violation of 28 U.S.C. § 1981, because Plaintiff "was treated dissimilarly to non-African-Americans in the ability to make and enforce a contract at Chase Bank." *Id.* at 4. Second, Plaintiff alleges that the investment account closure and the failure to return his funds violated 15 U.S.C. § 78j(b), because Defendants employed deceptive and manipulative practices to acquire and maintain the account. *Id.* Third, Plaintiff alleges that Defendants breached their contracts with him by closing the accounts and failing to return the balance in the investment account. *Id.* Fourth, Plaintiff alleges that the failure to return the investment deposit constituted conversion. *Id.* Fifth, Plaintiff alleges that he suffered intentional "embarrassment, emotional distress, and substantial financial loss" resulting from Defendants' actions.

9

Defendants originally filed their Motion for Summary Judgment on July 26, 2012. Doc. #24. Plaintiff filed his Response to Defendants' Motion for Summary Judgment on November 28, 2012. Doc. #41. Therein, Plaintiff sought leave to amend his Complaint to include CISC as a defendant. Defendants' Reply Memorandum in Support of their Motion for Summary Judgment was filed on December 5, 2012. Doc. #43.

On February 22, 2013, the Court issued a Decision and Entry granting Plaintiff leave to amend his Complaint to include CISC as a defendant, and overruling Defendants' Motion for Summary Judgment without prejudice to renewal. Doc. #44. The Court found that Plaintiff's delay in requesting leave to amend was unacceptable, in light of the fact that he received repeated reminders during discovery of the need to name CISC as a defendant. Nevertheless, because Defendants had already addressed all of Plaintiff's claims against CISC in their summary judgment arguments, they only had to renew the motion after amendment. The Court concluded that under Rule 15 of the Federal Rules of Civil Procedure, allowing the amendment would not cause Defendants to suffer any prejudice, and would serve the interests of justice. The Court, therefore, granted Plaintiff leave to file an Amended Complaint in order to name CISC as a defendant.

Plaintiff filed the Amended Complaint on March 11, 2013, naming CISC as a defendant. Doc. #46. However, Plaintiff made a number of other amendments that fell outside the scope of the leave granted by the Court, to wit: 1) naming as a defendant the entity "National Financial Services ('NFS') [aka] JPMorgan Clearing

10

Corp."; 2) in Paragraph 12, additional allegations that "Lumpkin informed Plaintiff that some at Chase believed that that was 'too much money for a black man' to have so something must be illegal" and that the account was opened with "illicit" funds; 3) an allegation of disparate treatment in Paragraph 15 that alleges "no white person's account at Chase Bank in Dayton has been closed under similar circumstances"; 4) new claims against NFS, in Paragraph 24, alleging "defamation" and "race based discrimination"; 5) allegations that NFS's information about him was false, and was provided as a pretext to discrimination, in Paragraph 17; and 6) Defendant Matthew Cox was omitted from the caption of the Amended Complaint, but Paragraph 6 still contains allegations against him personally.  Doc. #46.

During a conference call on March 11, 2013, the Court and the parties discussed 1) Plaintiff's unauthorized amendments; and 2) the failure of Plaintiff to depose John Lumpkin, who, according to the original allegations, was the source of Plaintiff's information and belief that discriminatory intent motivated the closure of his accounts.  The parties disputed the reasons that Plaintiff had not deposed Mr. Lumpkin during the discovery period.  The Court asked for simultaneous briefs to be filed by the parties addressing the issue, which were filed on March 21, 2013.  Doc. #48 and Doc. #49.  On March 25, 2013, Defendants also filed an Answer to Plaintiff's Amended Complaint.  Doc. #51.

After reviewing the parties' briefs, the Court issued an Order on July 8, 2013, requiring the production of Mr. Lumpkin for a deposition by Plaintiff.  Doc.

#51. Recognizing that the fault lay completely with Plaintiff's counsel for the failure to depose Lumpkin during discovery, the Court ordered Plaintiff to bear any and all costs for the deposition. *Id.* at 4.

During a status conference on August 12, 2013, the parties informed the Court that Plaintiff had deposed Mr. Lumpkin. Doc. #52. Accordingly, the Court filed an Entry on August 15, 2013, reinstating Defendant's Motion for Summary Judgment (Doc. #24), and providing a briefing schedule for the parties to file responsive and reply memoranda. *Id.*

On August 19, 2013, Plaintiff filed a Supplemental Response Memorandum to Defendants' Motion for Summary Judgment. Doc. #53. Therein, Plaintiff argues that Mr. Lumpkin's deposition provided enough evidence of discrimination to justify going to trial. *Id.* at 1-11. Plaintiff also makes a "request" that the Court reopen discovery, based on allegations that Defendants redacted and withheld documents material to his allegations of discrimination. *Id.* at 11-13.

Defendants filed a Supplemental Reply Memorandum in Support of their Motion for Summary Judgment and a Memorandum in Opposition to Plaintiff's Request to Reopen Discovery on September 3, 2013. Doc. #59. Therein, Defendants argue that Plaintiff provides only speculation and mischaracterization of Lumpkin's testimony, and fails to make a prima facie case of discrimination. *Id.* at 1-15. Defendants also argue that Plaintiff has failed to make the required showing under Rule 56(d) that would entitle him to have discovery reopened. *Id.* at 16-17.

Plaintiff filed a Reply Memorandum on September 8, 2013, in which he criticizes Defendants' actions during the discovery process and restates his arguments in support of taking his claim to trial. Doc. #60.

Finally, on December 24, 2013, Defendant filed five Motions *in Limine* (Doc. #62, Doc. #63, Doc. #64, Doc. #65, and Doc. #66) under Fed. R. Evid. 401, 402, and 403, in anticipation of trial set for January 21, 2014.

## II. THE UNAUTHORIZED AMENDMENTS IN PLAINTIFF'S AMENDED COMPLAINT (DOC. #46)

Rule 12(f) of the Federal Rules of Civil Procedure allows a district court to "strike from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter." Rule 12(f)(1) allows the Court to strike such matter "on its own" in the absence of a motion by either party. Although "motions to strike are disfavored," allegations may be stricken that "are clearly immaterial to the controversy" or would result in prejudice to a party. *Frisby v. Keith D. Weiner & Assoc. Co., LPA*, 669 F.Supp.2d 863, 865 (N.D. Ohio 2009) (citing *Brown & Williamson Tobacco Corp. v. United States*, 201 F.2d 819, 822 (6th Cir.1953)). When a court grants a party leave to amend a complaint, subsequent amendments that exceed the scope of the leave granted may be stricken under Rule 12(f). *E.g.*, *Helms v. Nationwide Ins. Co. of Am.*, 280 F.R.D. 354, 362 (S.D. Ohio 2012) (striking material from plaintiff's amended complaint "because the new allegations and claim against [defendant] clearly exceed any permissible bounds of the Court's prior grant," which only allowed plaintiff to name another defendant); *In re Keithley*

13

*Instruments, Inc.*, 599 F. Supp. 2d 908, 912 (striking complaint that exceeds scope of leave granted, stating that "[t]he Court certainly did not understand counsel's request as one for permission to reformulate the complaint, change the basis for the Court's jurisdiction, and assert new theories of liability based upon the same set of facts").

As noted above, *see supra* Section I.D., Plaintiff's Amended Complaint (Doc. #46) contains amendments that exceed the scope granted by the Court in its Decision and Entry of February 22, 2013 (Doc. #44).  Plaintiff's Amended Complaint adds new claims directed against National Financial Services ("NFS"), as well as a variety of new allegations and factual details concerning Plaintiff's theory of the case.  During the telephone status conference held with the parties the same day that Plaintiff filed the Amended Complaint, counsel for Defendants informed the Court that NFS was neither an affiliate nor a wholly owned entity of Defendants, but a stand-alone entity that would need to receive its own summons and service.  The Court expressed its concern that Plaintiff's amendments would prejudice Defendants in precisely the manner that the Court had intended to prevent when it limited the scope of amendment by stating that Plaintiff could only name CISC as a defendant.  Because CISC was a wholly owned subsidiary of Chase, and Defendants had addressed any claims against it in their summary judgment memorandum, the Court believed that such amendment would be a simple technical matter, and therefore not prejudice Defendants.

The Court finds that Plaintiff's non-authorized amendments were "impertinent," as they exceeded the scope of the leave that the Court granted, and that allowing them to remain in an active pleading would frustrate the purpose of the Court's original order. The Court, therefore, STRIKES all amendments Plaintiff made to the Amended Complaint, *except for* the naming of CISC as a defendant. The striking of said amendments restores the text of the original complaint, with the simple addition of CISC as a named defendant. For the sake of clarity, therefore, all references to allegations or the text will refer to Plaintiff's original complaint (Doc. #1).

Finally, although the Court takes this action upon its own motion, the Court notes that the parties were fully engaged with this issue during the aforementioned status conference. At that time, Plaintiff himself offered to withdraw the amendments after the Court orally granted leave to Defendants to file a motion to strike.

## III. PLAINTIFF'S "REQUEST" FOR ADDITIONAL DISCOVERY, CONSTRUED AS A MOTION FOR ADITIONAL DISCOVERY UNDER RULE 56(d)

Plaintiff's Supplemental Memorandum in Opposition to Defendants' Motion for Summary Judgment (Doc. #53), filed pursuant to the Court's scheduling order of August 15, 2013 (Doc. #52), contained, in addition to Plaintiff's arguments opposing summary judgment, a "Request to Re-Open Discovery." Doc. #53 at 11-13. In support of his request, Plaintiff alleges that during the discovery period, he

15

never received from opposing counsel any emails sent by Lumpkin "or other material documents concerning the decision-making process to close the accounts." *Id.* at 11. Plaintiff argues that Defendants inappropriately redacted the discovery documents that they did provide, and that Defendants produced them only 12 hours before a conference call with the magistrate judge who oversaw discovery, giving him no time to review them so that he could object to their form. *Id.* at 11-12. Plaintiff blames Defendants' delay in producing discovery documents (for which Defendants were sanctioned by Magistrate Judge Newman; see Doc. #17) for his own delay in requesting a deposition. *Id.* at 12. Plaintiff's counsel states that he planned to depose both Mr. Lumpkin and other witnesses, which he believed he would be able to do because 1) he had filed objections to the Magistrate Judge's discovery orders and 2) he believed that the Court would not "uphold [the] Magistrate Judge's decision that *sua sponte* determined that 'no additional discovery' is permitted." *Id.*

Defendants' oppose Plaintiff's request for additional discovery. They argue that Plaintiff has failed to fulfill Rule 56(d)'s requirements for additional discovery. Doc. #59 at 16-18. Furthermore, Defendants argue that "Plaintiff knew the identities of the decision makers [who closed his accounts] as of June 7, 2012, the date responses to his interrogatories were served . . . yet he elected not to depose [them] to develop the record regarding what information these individuals reviewed and what their thought processes were." *Id.* at 17.

16

Plaintiff's Reply argues that it was unfair to expect him to conduct all the depositions between June 8, 2012, the date he finally received responses to interrogatories, and June 26, 2012, the discovery cutoff date.  Doc. #60 at 1-2.  In addition, Plaintiff criticizes the Court's conclusion that he was at fault for failing to take Mr. Lumpkin's deposition before the discovery cutoff date.[3]  *Id.*

Rule 56(d)(2) of the Federal Rules of Civil Procedure allows the following: "If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition [to summary judgment], the court may . . . allow time to obtain affidavits or declarations or to take discovery," at its discretion.[4]  A request for additional discovery under Rule 56(d) generally requires the filing of an affidavit, but substantial compliance may suffice.  *See Cacevic v. City of Hazel Park*, 226 F.3d 483, 488-89 (6th Cir. 2000) (citing *Pfeil v. Rogers*, 757 F.2d 850, 856 (7th Cir.1985)).  A party requesting additional discovery must

---

[3] Plaintiff's Reply freely mixes additional verbiage in support of his position that Defendants' Motion for Summary Judgment should be overruled on the merits with his argument in support of reopening discovery.  Under Local Rule 7.2(a)(2), parties are only authorized to file opposing and reply memoranda to a pending motion. "No additional memoranda beyond those enumerated will be permitted except upon leave of court for good cause shown."  *Id.*  Plaintiff did not seek leave of the Court to file any additional response to his original memorandum in response to summary judgment.  Plaintiff may not circumvent the requirement to seek leave to present an additional memorandum by weaving those arguments into the body of a Reply brief that ostensibly addresses the separate issue of whether to reopen discovery.  Accordingly, the Court has only considered the portions of Plaintiff's Reply that correspond to the discovery issue.

[4] In 2010, Rule 56 was amended to incorporate former subdivision (f) "without substantial change" into subdivision (d).  Fed. R. Civ. P. 56, Advisory Committee Notes to 2010 Amendments.

demonstrate "its need for discovery, what material facts it hopes to uncover, and why it has not previously discovered the information." *Id*.

Plaintiff asserts that Counsel for Defendant withheld emails and redacted "material information" from the emails that were produced to him during discovery. Doc. 353 at 11. Plaintiff supports those accusations with several assertions. First, Plaintiff states that Lumpkin "confirmed" during the deposition that he "sent e-mails and made notes on the subject at issue" that Plaintiff never received during discovery. *Id*. at 11 (citing Lumpkin Dep., Doc. #57 at 32 & 41). Neither citation to Lumpkin's deposition supports the contention that Lumpkin's documents were purposefully withheld from Plaintiff. When deposed, Lumpkin stated that he would have notified Fayah Nyumah that he had acquired Plaintiff's account, but could not "remember if there was email correspondence or not." Doc. #57 at 32. Furthermore, Lumpkin only stated that he "did notify" Williams that he had acquired Plaintiff's account, but did not specify the form of notification. *Id*. Lumpkin only speculated as to whether he emailed Nyumah, and did not state how he notified Williams. Thus, Lumpkin's statements do not demonstrate that such emails even existed.

More importantly, however, Plaintiff does not explain or describe "what material facts [he] hopes to uncover" from Lumpkin's notifications that would support his claim that Defendants discriminatorily closed his accounts. *Cacevic*, 226 F.3d at 488-89. Lumpkin's testimony suggests that any emails he sent to Nyumah and Williams the day the accounts were opened would have been sent to

18

notify them that Lumpkin had, in fact, acquired Plaintiff's investment account. Plaintiff does not, for example, suggest that *Lumpkin* was the source of any discriminatory animus. Instead, Plaintiff has always alleged that Lumpkin informed him of Defendants' possible discriminatory decision-making. *See* Wheat Aff. ¶¶ 14-15 (Doc. #41 at 38). Lumpkin stated that he was not aware that Plaintiff's account had been "frozen," until Plaintiff came into the bank one day and Lumpkin unsuccessfully attempted to pull up the account. Doc. #57 at 37. Thus, it is impossible to infer that any emails sent from Lumpkin to Nyumah or Williams on the day that the accounts were opened would reveal material evidence of discrimination to support Plaintiff's claims.

Plaintiff also complains that he never received notes that Lumpkin made investigating the closure of Plaintiff's accounts, the subject of the following exchange during Lumpkin's deposition:

> Q. Did you make any notes or anything so that you [could] inform Mr. Wheat [of] what you learned?
>
> A. Yes, I did. Yes, I did. I couldn't tell you where those are now because –
>
> Q. That's all right. That's all right.

Doc. #57 at 42.

There is no indication that Lumpkin's notes were ever in Defendants' possession. Furthermore, not only did counsel for Plaintiff not follow up or question Lumpkin regarding the notes, he cut Lumpkin off as he was describing

what happened to them and began questioning him on another topic. *Id.* Plaintiff cannot now argue that he did not have the opportunity to pursue this information.

Furthermore, Plaintiff points to a statement by Chad M. Borton[5] to Williams in an email sent on August 1, 2011, stating "I actually heard about this from our Main branch a few months ago. What do you want to do?" Doc. #42-4. Plaintiff claims that 1) this statement contradicts "claims" made by Defendant; 2) an unidentified document was attached to the email that Plaintiff never received in discovery; and 3) Plaintiff never received "other material documents concerning the decision-making process to close the accounts," or only received inappropriately redacted versions. Doc. #53 at 11.

At the most, Borton's email shows that Borton was aware that Plaintiff's account had been closed before Williams knew about it. Rather than contradict Defendant's claims, as Plaintiff argues, the email appears to corroborate their assertion that the decision makers were not located at the Dayton branch. Regarding the unidentified document attached to the email, the Court is unable to evaluate the issue. Plaintiff does not identify the document. If he now has access to it, there is no issue. If he does not, he does not explain what the document is, how he knows about it, or how it is material to his claims. The Court does not accept the content of Borton's email or a vague reference to an attached document as evidence that discovery should be reopened.

---

[5] Plaintiff identifies the author of the email as "a Mr. Bolten," but the email referenced appears to be written by Chad M. Borton. Doc. #42-4.

Plaintiff has also made allegations that Defendants provided him with documents from which material information was inappropriately redacted. Doc. #53 at 11. Plaintiff made these allegations previously, when responding to Defendants' original Motion for Summary Judgment, and attached the emails as Exhibit 8 and Exhibit 9 to his Response to support those allegations. Doc. #41 at 19; Doc. #42-4 (Ex. 8); Doc. #42-5 (Ex. 9). At that time, Defendants accused Plaintiff of doctoring the allegedly redacted emails, and attached copies of the emails that they claimed to have produced to Plaintiff as Exhibit D and Exhibit E. Doc. #43 at 6-7; Doc. #43-4 (Ex. D); Doc. #43-5 (Ex. E). The emails in Plaintiff's exhibits contain no information, other than the Borton email quoted above. Two of the three pages provided are almost completely blank except for the word "REDACTED." Doc. #42-5. In contrast, the emails in Defendants' exhibits contain pages of emails in which Defendants' employees discuss the reasons for closing Plaintiff's accounts. Those pages are completely missing from Plaintiff's exhibits. Furthermore, the pages of Plaintiff's exhibits and the pages of Defendants' exhibits that bear the Bates stamp numbers Chase 5 and Chase 322 are not identical. Specifically, Plaintiff's Chase 5 and Chase 322 pages are blank in the places where Defendants' Chase 5 and Chase 322 pages contain the text of emails sent between its employees. Plaintiff does not address Defendants' accusation that Plaintiff doctored the allegedly redacted emails or provide any explanation for the differences in the exhibits. He simply repeats the same claims of inappropriate

21

redaction and points to the exhibits that Defendants accuse him of altering to support those claims.

The accusations are serious.  However, the Court is not deciding a Rule 11 motion.  Rather, the issue is whether Plaintiff is entitled to have discovery reopened under Rule 56(d).  He is not.  Plaintiff has selectively presented pages produced by Defendants to make his case.  His Exhibit 9 contains only two pages, which are Bates-stamped Chase 5 and Chase 14.  Doc. #42-5.  Plaintiff claims that discovery should be reopened because material information was withheld from him, but the Court does not accept the allegation that he never received pages 6 through 13 from Defendants.  Furthermore, Plaintiff has unequivocally had access to those pages since December 5, 2012, the date that Defendants filed their Reply brief and attached the entire email trail that Plaintiff claims was withheld from him.  Doc. #43.  Those pages contain information material to his claims.  He may not like that information, because it does not support his claim of discrimination.  Nevertheless, he has the material that he desires and that discovery is designed to reveal --- evidence to support or disprove his claims.

Plaintiff fails to demonstrate any compelling reason to reopen discovery.  He cannot continue to blame his litigation difficulties on Defendants' untimely production of discovery documents, which occurred in spring of 2012, and was resolved by early June of that year.  Plaintiff filed a Motion to Compel on May 23, 2012 (Doc. #9), and Defendants were sanctioned by the Magistrate Judge on July 3, 2012 (Doc. #17).  According to the Magistrate Judge's Order, Defendants

22

served Plaintiff with Responses to Plaintiff's Requests for Admission on May 24, 2012, and Plaintiff had Responses to Interrogatories and Requests for Production of Documents by June 7, 2012. Doc. #17 at 3. At that time, the matter was concluded.

Plaintiff was then offered extra time by Defendants' counsel to depose Lumpkin through the summer of 2012. He failed to do so, and blamed Defendants' discovery delay. Doc. #48 at 3. On November 28, 2012, the discovery delay served as an excuse for the untimely filing of Plaintiff's Response to Defendants' Motion for Summary Judgment (Doc. #40 at 2), in spite of having been granted extensions of time to respond (Doc. #27 and Doc. #31). Now, again, he points to Defendants' long-ago discovery delay as a justification for reopening discovery. However, the evidence in the record indicates that Plaintiff has had ample opportunity to obtain discovery. He received responses to discovery requests by June of 2012, and the Court allowed him to depose Lumpkin even *after* Defendants' filed their Motion for Summary Judgment. Plaintiff cannot demonstrate a further need for discovery. He has not identified material facts that any further discovery would yield, and has not demonstrated that he was prevented from previously discovering information material to his claim. *Cacevic v. City of Hazel Park*, 226 F.3d 483, 488-89. In conclusion, he has failed to comply, in form or substance, with the requirements of Rule 56(d). Accordingly, the Court overrules his request for additional discovery, construed as a motion under Rule 56(d).

23

## IV.    DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DOC. #24)

Defendants have moved for summary judgment on each of Plaintiff's five

claims.[6] After setting forth the legal standard for summary judgment, the Court

will address the parties' arguments for and against summary judgment with respect

to Plaintiff's claims.

### A.    Summary Judgment Standard

Under Rule 56 of the Federal Rules of Civil Procedure, a party may move for

summary judgment on any particular claim or defense, of part thereof.  Upon

motion by either party, "[t]he court shall grant summary judgment if the movant

shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A party

demonstrates that a fact is or is not genuinely disputed by "citing to particular

parts of materials in the record, including depositions, documents . . . affidavits or

declarations . . . or showing that the materials cited do not establish the absence

or presence of a genuine dispute, or that an adverse party cannot produce

admissible evidence to support the fact."  *Id.* 56(c)(1).  Any material cited to

support the assertion that a fact is not in dispute must be "in a form that would be

---

[6] The Court notes that Defendants filed their original Motion for Summary
Judgment on behalf of only Chase and Cox, as CISC was not at that time a named
defendant.  Plaintiff amended his Complaint to include CISC as a defendant, and
Defendants have confirmed that "[t]he moving Defendants" are Chase, CISC, and
Cox.  Doc. #59 at 4 n.1.

admissible in evidence" at trial. *Id.* 56(c)(2). This includes affidavits, which "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." *Id.* 56(c)(4). "Generalized assertions lacking the support of a particularized citation do not suffice, as the Court has no "obligation to 'wade through' the record for specific facts" in support of a party's arguments. *United States v. WRW Corp.*, 986 F.2d 138, 143 (6th Cir. 1993) (citing *InterRoyal Corp. v. Sponseller*, 889 F.2d 108 (6th Cir. 1989)).

The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant's burden is to demonstrate "the absence of a genuine issue of material fact as to at least one essential element on each of the Plaintiff's claims." *Johnson v. University of Cincinnati*, 215 F.3d 561, 572 (6th Cir. 2000) (citing *Celotex*, 477 U.S. at 322).

Once the moving party has demonstrated that no disputed issue of material fact exists, the burden shifts to the nonmoving party. *Celotex*, 477 U.S. at 324. The nonmovant must then present evidence of a genuine dispute of a material fact that only a jury can resolve. *Id.* At this stage, it is not sufficient for the nonmoving party to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the nonmoving party must "go beyond the pleadings" and

25

present some type of evidentiary material that demonstrates the existence of a genuine dispute. *Celotex*, 477 U.S. at 324. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. Conversely, material facts in genuine dispute that "may reasonably be resolved in favor of either party" require denial of summary judgment and submission to a jury for their resolution. *Anderson*, 477 U.S. at 250.

When ruling on a motion for summary judgment, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in that party's favor. *Id*. at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)). A court must avoid "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts," which are "jury functions" that are inappropriate to engage in when ruling on a motion for summary judgment. *Anderson*, 477 U.S. at 255. A court granting summary judgment should always act with "caution," and not hesitate to deny summary judgment "where there is reason to believe that the better course would be to proceed to a full trial." *Id.*

**B.    Plaintiff's 42 U.S.C. § 1981 Discrimination Claim (Count One)**

Under 42 U.S.C. § 1981, all persons are afforded the equal right "to make

and enforce contracts," regardless of race.  Section 1981 applies to "the making,

performance, modification, and termination of contracts, and the enjoyment of all

benefits, privileges, terms, and conditions of the contractual relationship."  *Id.*

§ 1981(b).  The statute "prohibits intentional race discrimination in the making and

enforcing of contracts with both public and private actors."  *Christian v. Wal-Mart*

*Stores, Inc.*, 252 F.3d 862, 867-68 (6th Cir. 2001).  In 1991, Congress amended

Section 1981 "to embrace all aspects of the contractual relationship, including

contract terminations," and by doing so, "enlarged the category of conduct that is

subject to § 1981 liability."  *Rivers v. Roadway Exp., Inc.*, 511 U.S. 298, 303

(1994).  Although many Section 1981 claims involve employment discrimination,

the statute also encompasses "claims of discrimination in retail and service

settings."  *Christian*, 252 F.3d at 868.

A prima facie case of racial discrimination under 42 U.S.C. § 1981 in the

"commercial establishment context" requires plaintiff to demonstrate that:

>    (1) plaintiff is a member of a protected class;

>    (2) plaintiff sought to make or enforce a contract for services ordinarily
>        provided by the defendant; and

>    (3) plaintiff was denied the right to enter into or enjoy the benefits or
>        privileges of the contractual relationship in that (a) plaintiff was deprived
>        of services while similarly situated persons outside the protected class
>        were not and/or (b) plaintiff received services in a markedly hostile
>        manner and in a manner which a reasonable person would find
>        objectively discriminatory.

*Christian*, 252 F.3d at 871-72. The *Christian* test modifies the language of the

typical Section 1981 claim, which usually involves employment discrimination, so

that a plaintiff bringing a commercial establishment claim is not required to show

intentional discrimination in order to state a prima facie case. *Christian*, 252 F.3d

at 872. Even so, a Section 1981 plaintiff always bears the burden of ultimately

proving that intentional discrimination occurred. *Id.* (citing *General Bldg.*

*Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 389 (1982)).

A plaintiff may prove intentional discrimination with either direct or indirect

evidence. *Amini v. Oberlin College*, 440 F.3d 350, 358 (6th Cir. 2006). Direct

evidence of discrimination "proves that discrimination has occurred without

requiring further inferences." *Reeves v. Swift Transp. Co., Inc.*, 446 F.3d 637

(6th Cir. 2006). "Evidence of discrimination is not considered direct evidence

unless a racial motivation is explicitly expressed." *Amini*, 440 F.3d at 359. If a

plaintiff offers indirect evidence to support a Section 1981 claim, a court applies

the burden-shifting analysis established by the Supreme Court in *McDonnell*

*Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Texas Dept. of Comm. Affairs*

*v. Burdine*, 450 U.S. 248 (1981). *Christian*, 252 F.3d at 868. The *McDonnell*

*Douglas-Burdine* burden-shifting analysis unfolds in three steps:

> First, the plaintiff has the burden of proving by the preponderance of
> the evidence a prima facie case of discrimination. Second, if the
> plaintiff succeeds in proving the prima facie case, the burden shifts to
> the defendant "to articulate some legitimate, nondiscriminatory reason
> for the employee's rejection." Third, should the defendant carry this
> burden, the plaintiff must then have an opportunity to prove by a
> preponderance of the evidence that the legitimate reasons offered by

28

the defendant were not its true reasons, but were a pretext for
discrimination.

*Burdine*, 450 U.S. at 252-53 (quoting *McDonnell Douglas*, 411 U.S. 792,
802 (1973)) (citations omitted).

Defendants argue that Plaintiff's Section 1981 claim is subject to the
burden-shifting framework of *McDonnell Douglas/Burdine* and assume, for the
purposes of their motion, that he states a prima facie case of racial discrimination.
Doc. #24 at 8. However, they argue that the reputational risk to the bank, based
on Plaintiff's "previous criminal convictions and the State of Ohio's investigation of
his business practices," constituted a legitimate, nondiscriminatory reason for
closing the accounts. *Id.* at 9. Furthermore, Defendants argue that Plaintiff
cannot show pretext because any inference of discrimination is impossible when
the individuals who decided to close the accounts "are not located in Dayton, do
not know Plaintiff, did not know his race, and did not have any interaction with
Chase Bank or CISC employees located in Dayton." *Id.* at 10.

Plaintiff agrees that the *McDonnell Douglas-Burdine* analysis applies to his
claims. Doc. #41 at 23. However, he argues that he can show not only the prima
facie case necessary for his Section 1981 claim, but, that if a "mixed motive"
analysis is applied to his claims, statements made to him by Lumpkin show that
race discrimination factored into Defendants' decision to close his accounts. *Id.* at
24. With specific reference to the third prong of the prima facie case under
*Christian*, Plaintiff argues that "reviewing <u>unsubstantiated</u> newspaper articles

29

without notifying Mr. Wheat," allowing him to respond, or "just merely substantiating the reports, is not only the type [of] arbitrary conduct that supports the inference of discrimination, but it is widely outside accepted business norms." *Id.* at 26. Plaintiff argues further that closing his investment account without notifying him was also outside normal business practices, as well as contrary to CISC's financial interests. *Id.* at 27. Furthermore, Wheat argues that his own affidavit "repeating the words of Mr. Lumpkin" constitutes direct evidence of discrimination. *Id.* at 28. Even if that direct evidence were not admissible, he argues, the Defendants' investigation itself demonstrates pretext. *Id.* Plaintiff believes that either Defendants conducted a "serious investigation," in which case they would have actually known his race, or they did not actually conduct one in order to use it as a pretext for a race-based decision. *Id.*

Recognizing that the viability of Plaintiff's discrimination claim hinged upon Lumpkin's testimony, the Court ordered Defendants to produce Lumpkin for deposition by Plaintiff. *See supra* Section I.D. Following the deposition, Plaintiff filed a Supplemental Memorandum, in which he argues that Lumpkin's deposition provided enough evidence of discrimination to justify going to trial. Doc. #53. Plaintiff points to statements by Lumpkin that the freeze on Plaintiff's account was "handled differently" than other account freezes involving Lumpkin's non-African-American clients; the fact that Lumpkin was not told in advance of the account freeze; Cox's interruption that treated both Plaintiff and Lumpkin "adversely and differently" when Cox "burst in" to their meeting, which he had never done with a

30

white client; and the "strange" fact that on the day Plaintiff opened his investment account, other employees "had [Plaintiff's] check for a long time" and "people came from the back" of the branch office, even though large deposits were not unusual at the downtown branch. *Id.* at 3-5. Plaintiff points to the disputed fact that he said it was Lumpkin who attributed that "strange" behavior to "the suspicion of a black man having that much money," while Lumpkin, although "not sure," attributed the statement to Plaintiff. *Id.* at 5. Plaintiff argues that Lumpkin's deposition corroborates his own assertions that they had discussed race and the "suspicion of a black man having that type of money," and that the "material point" is the fact that Lumpkin agreed with Plaintiff, not who said what first. *Id.* at 5-6. Plaintiff believes that the behavior of Cox and the other employees shows that the decision to investigate him originated at the Dayton branch and was "based upon nothing more than a black 'having that much money.'" *Id.* at 7. Finally, Plaintiff argues that racial animus can be inferred from the fact that Williams and Lumpkin did not believe that doing business with him created any risk when he opened his accounts. Because Defendants' own employees disagreed with its position, Plaintiff believes the Court is required to deny summary judgment. *Id.* at 8-9.

Defendants respond by accusing Plaintiff of failing to ask "questions about key points" during Lumpkin's deposition as a strategy to make the testimony appear to support Plaintiff's version of events. Doc. #59 at 1-2. Specifically, Defendants accuse Plaintiff of purposefully asking Lumpkin only *whether* he and

Plaintiff discussed race and suspicions of discrimination while avoiding the question of *who* introduced those subjects. Doc. #59 at 1. When Defendants asked Lumpkin that "obvious follow-up question," he stated that Plaintiff brought up the racial concerns. *Id.* at 2-3. According to Defendants, this demonstrates that statements in Plaintiff's affidavit "are simply false." *Id.* at 3. Defendants further argue that Lumpkin's testimony supports their argument that none of the decision makers were aware of Plaintiff's race, and that Plaintiff's assertions that they must have known his race amount to no more than speculation. *Id.* at 5-7. Defendants also claim that Plaintiff fails to show pretext because he is not similarly situated to the persons whose accounts were closed with prior notification to Lumpkin, and Cox's intrusion was nothing more than rudeness. *Id.* at 8-10. Furthermore, Defendants argue that, as a matter of law, any flaws or deficiencies in their investigation cannot demonstrate pretext without some independent indication of discriminatory animus. *Id.* at 9-12. Finally, Defendants return to Plaintiff's prima facie case, which they claim he cannot even make out without some evidence that the decision makers who closed his accounts knew his race. *Id.* at 12-14.

The Court will first address the issue of direct evidence of discrimination, because some of Plaintiff's arguments appear to suggest that such evidence exists. The Court will then turn to the burden-shifting analysis applicable to discrimination claims based on indirect evidence.

1.     *Plaintiff offers only inadmissible hearsay as direct evidence of discrimination.*

To support his Section 1981 claim, Plaintiff offers his own affidavit "repeating the words of Mr. Lumpkin concerning the race-based animus at issue," which he characterizes as direct evidence of discrimination.  Doc. #41 at 28.  The words in question appear in paragraphs 14 and 15 of Plaintiff's affidavit:

> 14.     . . . Mr. Lumpkin told me that my accounts were ordered closed because someone at Chase became suspicious because a "Black Man" having that type of money meant that he had done something wrong.  Mr. Lumpkin believed that this suspicion caused the initial investigation.  He said, "Some also mentioned a money laundering conviction and they may have used that in justifying closing the accounts."

> 15.     During another conversation with Mr. Lumpkin, he said that it was someone who worked at the downtown Dayton Chase Bank who became suspicious due to my race and it was that person who contributed or caused the initial investigation to occur.

Under Rule 56(c)(4), any "affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Thus, the admissibility of the foregoing statements must be guaranteed before they can be properly considered on summary judgment, or as evidence of direct discrimination.  *See Back v. Nestle USA, Inc.*, 694 F.3d 571, 576 (6th Cir. 2012) (reviewing admissibility of statements offered as direct evidence of age discrimination).

33

Hearsay is a declarant's out of court statement that is offered for the truth of what it asserts, and it is not admissible as evidence. Fed. R. Evid. 801(c) & 802. Here, Plaintiff has offered several statements for the truth of what they assert. Someone allegedly articulated the fact that he or she "became suspicious," based on the amount of Plaintiff's deposit, his race, and "the money laundering conviction," all of which Lumpkin allegedly repeated to Plaintiff. However, Lumpkin is not the only declarant with statements at issue. The statements contain both statements attributed to Lumpkin, and, within them, a second layer of statements attributed to other, unknown employees. Thus, Plaintiff's affidavit presents a double hearsay problem. Double hearsay is not inadmissible, however, "if each part of the combined statements conforms with an exception to the rule." Fed R. Evid. 805.

The Sixth Circuit addressed a similar double hearsay problem in *Back v. Nestle USA, Inc.*, 694 F.3d 571 (6th Cir. 2012). In *Back*, an age discrimination case, the plaintiff attempted to introduce a coworker's statement that the defendant's human resources director repeated a statement by someone in higher management about a plan to terminate the plant's oldest employees. *Id.* at 576. The human resource director's statement to the coworker qualified as non-hearsay under Federal Rule of Evidence 801(d)(2)(D), which applies to a statement by a "party's agent or

34

employee on a matter within the scope of that relationship and while it existed." *Id.* at 577.

Because the person from higher management was not identified, the court characterized the admission of that person's statement as "problematic – but not impossible" under Rule 801(d)(2)(D). *Id.* at 578. To admit the statement, "[t]he crucial question is whether there is evidence that the unidentified declarants were speaking on a matter within the scope of their employment." *Id.* The rule itself provides some guidance, as it states that "[t]he statement must be considered but does not by itself establish . . . the existence or scope of the relationship" in question. *Id.* (quoting Fed. R. Evid. 801(d)(2)). Evidence to establish the scope of the relationship may also "come from the 'circumstances surrounding the statement, such as the identity of the speaker [or] the context in which the statement was made.'" *Id.* (quoting Fed. R. Evid. 801, advisory committee notes, 1997 amend.). With no evidence in the record to demonstrate the scope of the employment of the unknown declarants, the court could only examine the "identity of the speaker," the employee-affiant. *Id.* Because of his low-level position, the employee-affiant could not have been "privy" to the alleged termination plan. Without other evidence to satisfy the scope requirement of the rule, the second level of hearsay prevented the statement from being admissible. *Id.*

The same principles apply here. Lumpkin was an employee of CISC, a defendant in the present action. Statements by Lumpkin to Plaintiff about

35

the account that Lumpkin managed fell within the scope of Lumpkin's

employment relationship, and could, therefore, be considered non-hearsay

under Evidence Rule 801(d)(2)(D). However, as in *Back*, the admissibility

stops at the first level of hearsay. Plaintiff provides no evidence about the

identity of any declarant other than Lumpkin, so there is no way to ascertain

whether the statements attributed to those persons pertained to matters

within the scope of their employment. Plaintiff's questions during Lumpkin's

deposition did not even address the statements in Plaintiff's affidavit

attributed to unknown employees, much less inquire about the scope of

such persons' employment. Furthermore, Lumpkin stated that neither

Williams nor Cox knew anything about the reasons for the closure of

Plaintiff's accounts, so the hearsay statements set forth in his affidavit

cannot be attributable to them. Without any evidence of the scope of the

relationship of those speakers to Defendants, their statements cannot be

considered admissible as non-hearsay under Fed. R. Evid. 801(d)(2)(D), and

do not qualify as an exception to the hearsay rules. Because the statements

offered in Plaintiff's affidavits are inadmissible, the Court cannot consider

them as evidence in its summary judgment analysis. Plaintiff therefore, has

pointed to no direct evidence of discrimination to support his Section 1981

claim.

### 2.    *Indirect evidence of discrimination – the Prima Facie Case*

Because Plaintiff has no direct evidence of discrimination, the Court will

employ the burden-shifting analysis set forth in *McDonnell Douglas* and *Burdine* to

determine whether, based on the undisputed facts, a reasonable jury might

conclude that indirect evidence supports Plaintiff's claim.  A Section 1981 plaintiff

bears the initial burden of establishing a prima facie case of discrimination, but the

burden is not intended to be onerous.  *Keck v. Graham Hotel Sys., Inc.*, 566 F. 3d

634 (6th Cir. 2009) (citing *Burdine*, 450 U.S. at 253)).

Defendants do not dispute that Plaintiff satisfies the first two elements of a

prima facie case of racial discrimination under 42 U.S.C. § 1981.  Doc. #59 at 12;

*Christian*, 252 F.3d at 872.  As an African-American, he is indisputably a member

of a protected class.  Furthermore, Plaintiff sought to maintain a contractual

relationship with Defendants through banking and investment accounts, services

that they ordinarily provide.

*Christian* provides two options for a plaintiff to show that he or she "was

denied the right to enter into or enjoy the benefits or privileges of the contractual

relationship," the crucial third element of the prima facie case.  *Id.*  First, the

plaintiff may show that he or she "was deprived of services while similarly situated

persons outside the protected class were not," the option that "offers the most

traditional method of proving discrimination" circumstantially.  *Id.* at 872-73.

Additionally, a plaintiff may show that he or she "received services in a

markedly hostile manner and in a manner which a reasonable person would find

37

objectively discriminatory." *Id.* at 872. The Sixth Circuit adopted the second

option "to account for situations in the commercial establishment context in which

a plaintiff cannot identify other similarly situated persons." *Id.* at 871 (citing and

quoting *Callwood v. Dave & Buster's, Inc.*, 98 F. Supp. 2d 694, 707-08 (D. Md.

2000)). This option "also allows a plaintiff to state a claim when similarly situated

persons are not available for comparison, as will often be the case in the

commercial establishment context." *Id.* at 873. Several factors may demonstrate

the "markedly hostile" conduct, including "whether the conduct 'is (1) so

profoundly contrary to the manifest financial interests of the merchant and/or her

employees; (2) so far outside of widely-accepted business norms; and (3) so

arbitrary on its face, that the conduct supports a rational inference of

discrimination.'" *Id.* at 871.

      For several reasons, Plaintiff satisfies the third element of the prima facie

case. First, Plaintiff initially deposited $450,000 with Chase, and then used

$150,000 of that deposit to open an investment account with CISC. The abrupt

closing of those accounts is, on its face, "profoundly contrary to the manifest

financial interests" of Defendants' banking and investment businesses. *Id.* By

closing the accounts, Defendants deprived themselves of all future profits to be

earned from Plaintiff's substantial deposit, such as interest from lending or fees

incurred in investment transactions. *See, e.g.*, *Keck v. Graham Hotel Sys., Inc.*,

566 F. 3d 634, 641 (6th Cir. 2009) (finding that defendant hotel's "complete

failure to consummate" transaction with plaintiff for wedding reception was

contrary to defendant's financial interests, and, therefore, sufficient to satisfy

"markedly hostile" element of a prima facie case under Section 1981).

Furthermore, by closing Plaintiff's accounts and terminating a nascent business

relationship with a prominent local businessman, Defendants risked damage to

their reputations in the community through word of mouth about his negative

experiences.  It is obvious that such reputational damage to Defendants was also

contrary to their financial interests.

Another factor demonstrating the "markedly hostile" element is whether

Defendants' conduct is "so arbitrary on its face, that the conduct supports a

rational inference of discrimination." *Id.*  Lumpkin described arbitrary conduct that

occurred when Plaintiff opened his investment account; the unexplainable delay in

processing the $150,000 for the account; the "strange" manner in which persons

"came from the back" that "wasn't what [Lumpkin] was used to seeing;" and

Cox's "rude" interruption during Plaintiff's initial consultation with Lumpkin.  Doc.

#57 at 76, 79.  Considered alone, the foregoing actions do not raise the inference

that they were motivated by discrimination.  Nevertheless, Plaintiff perceived them

as such, because they prompted him to ask Lumpkin whether they resulted from

Defendant's employees being unaccustomed to seeing "black people bringing in

this type of money." *Id.* at 78.  When Lumpkin, a CISC employee, replied to

Plaintiff and confirmed his fears, stating "[n]o, they're not," he provided Plaintiff

with an objective reason to believe that race motivated the Defendants' conduct.

Lumpkin's confirmation also provided Plaintiff with a reason to believe that he was

being treated differently than other similarly situated, non-African-American customers whose deposits did not cause delays, "strange" employee movements, and interruptions. Lumpkin, Defendants' own representative, confirmed to Plaintiff that the way that other employees were acting was *because* of Plaintiff's race. It was, therefore, reasonable for Lumpkin's statement to affect the way Plaintiff perceived Defendants' subsequent actions, including the account closures. For that reason, Defendants' arbitrary conduct "supports a rational inference of discrimination" that weakly satisfies the third element of the prima facie case, both through the "markedly hostile" test and Lumpkin's description of disparate treatment.[7]

---

[7] Although Plaintiff's Complaint alleges that he was treated differently from similarly situated persons outside his class, the parties primarily focus on the "markedly hostile" test for establishing the third element of a prima facie case. No specific comparators are discussed in the parties' memoranda. Defendants simply assume for the purposes of their Motion for Summary Judgment that Plaintiff can make out a prima facie case, and then turn to their legitimate non-discriminatory reasons and the issue of pretext. Doc. #24 at 11-19. Plaintiff's Response does not argue disparate treatment or point to any evidence that shows there was comparable treatment of non-African-American customers. Doc. #41 at 24-27. The examples of disparate treatment Plaintiff presents in his Supplemental Memorandum include the "strange" employee behavior and Cox's interruption of the meeting between Plaintiff and Lumpkin. Doc. #53 at 3-4. Those are discussed above, as their arbitrary nature primarily supports the third element of the prima facie case based on "markedly hostile" conduct. Plaintiff also points to CISC's failure to inform Lumpkin that it froze Plaintiff's account, in contrast to informing Lumpkin before closing other, non-African-American customers' accounts. *Id.* at 3. However, CISC did not treat Plaintiff differently from other customers when it failed to inform Lumpkin that Plaintiff's account was frozen. CISC may have treated *Lumpkin* differently by not informing him beforehand, but it treated Plaintiff the same as the other accountholders. CISC froze all of their accounts.

There are, of course, other inferences that could be drawn. However, inferences are drawn in Plaintiff's favor on summary judgment, as the party against whom the motion is directed, and Plaintiff's burden at this stage is non-onerous. Defendants argue that Plaintiff cannot make out a prima facie case where the decision makers who closed Plaintiff's accounts were not aware of his race. Doc. #59 at 12-14. However, as discussed, some of the conduct that supports Plaintiff's prima facie case occurred when he opened the investment account at CISC, even though the gravamen of his claim concerns the closure.

Based on the foregoing, the Court concludes that Plaintiff has satisfied his burden of showing a prima facie case of discrimination for commercial services under Section 1981.

### 3.    *Defendants had legitimate, nondiscriminatory reasons for closing Plaintiff's accounts.*

Once Plaintiff's prima facie case has been established, the burden shifts to Defendants "to articulate some legitimate, nondiscriminatory reason" for its actions. *Burdine*, 450 U.S. at 252-53 (quoting *McDonnell Douglas*, 411 U.S. at 802). Defendants' burden at the second stage of the burden-shifting analysis "is one of production, not persuasion." *Christian*, 252 F.3d at 879. According to Defendants, "the decisions were made because negative media reports about Plaintiff's previous criminal convictions and the State of Ohio's investigation of his business practices presented a reputational risk to Chase Bank and CISC." Doc. #24 at 10. A company's concern about its reputation is a legitimate reason to

terminate a business relationship. Furthermore, Defendants' reasons are not based on race, but rather, concern over their own reputation. Thus, they are nondiscriminatory. A reasonable jury could find, therefore, that Defendants have produced a legitimate, nondiscriminatory reason for closing Plaintiff's accounts, and the inquiry turns to the final stage of the burden-shifting analysis.

###### 4. *Based on the undisputed evidence, no reasonable jury could find that Defendants' reasons were pretextual.*

Once the defendant has fulfilled the burden of producing a legitimate, "non-discriminatory reason for its action, the presumption of discrimination falls away and the production burden shifts back to the plaintiff, who must prove by a preponderance that the defendant's stated reason was not its true reason, but was a pretext for discrimination." *Christian*, 252 F.3d at 879 (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142-43 (2000)). A plaintiff may prove pretext for intentional discrimination "by showing that 1) the stated reasons had no basis in fact; 2) the stated reasons were not the actual reasons; [or] 3) that the stated reasons were insufficient to explain the defendant's action." *Id.* (quoting *Johnson v. University of Cincinnati*, 215 F.3d 561 (2000)); *see also Manzer v. Diamond Shamrock Chems.*, 29 F.3d 1078, 1084 (6th Cir. 1994) (*overruled on other grounds by Geiger v. Tower Auto.*, 579 F.3d 614 (6th Cir. 2009)). The question on summary judgment "is whether the plaintiff has produced evidence from which a jury could reasonably doubt the [defendant's] explanation. If so, her prima facie case is sufficient to support an inference of discrimination at

42

trial." *See Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993)). Conversely, "summary judgment is proper if, based on the evidence presented, a jury could not reasonably doubt the [defendant's] explanation." *Id.* (citing *Reeves*, 530 U.S. at 148).

To support their motion for summary judgment, Defendants argue that the undisputed evidence shows that none of their employees who made the decisions to terminate Plaintiff's accounts knew of his race. Doc. #24 at 11-12. They argue that a Section 1981 claim must fail as a matter of law where the decision makers do not know of the plaintiff's race, because that fact makes it impossible to infer the existence of any purposeful racial animus that motivated the decision affecting the plaintiff. *Id.*

The Court agrees with Defendants' argument. No reasonable jury could infer that racial animus motivated Defendants' decisions. George Massa, the Chase compliance manager who made the recommendation to close Plaintiff's Chase accounts and restrict the investment account, was based in New Jersey. He did not know that Plaintiff was African-American. Doc. #24-6.

Furthermore, Steve Dahlke, the CISC compliance manager, agreed with Massa's recommendations after receiving them. Dahlke is based in Columbus, Ohio, and also did not know that Plaintiff was African-American. Doc. #24-4. Dahlke made the ultimate determination to close Plaintiff's investment account on behalf of CISC. *Id.* at 2.

Valerie Mangan, Chase's Senior Compliance Officer for Consumer and Business Banking, had "final authority in decisions to end client relationships" for the bank. Doc. #24-5. Based on Massa's recommendation, she directed Chase to close Plaintiff's checking and savings accounts. *Id.* at 2. Mangan did not know Plaintiff personally, did not know his race, and only learned of it after Plaintiff filed suit against Defendants. *Id.*

Furthermore, Defendants' affidavits are bolstered by Plaintiff's Exhibit 12, an internal compliance report in which Massa documented and dated the referral to Dahlke, as well as the reasoning, recommendations, and decisions of Massa and Mangan. Plaintiff's race is mentioned nowhere in the report. The report also contains the text of the newspaper articles concerning Plaintiff, none of which mention his race. Doc. #42-7. Finally, Exhibit D to Defendants' Reply contains an email trail in which Massa provides the reasons for closing Plaintiff's accounts to employees inquiring on behalf of Williams. Doc. #43-4. The emails include the text of the news articles about Plaintiff's convictions and the state investigation of his business. Neither the articles nor the email trail contains any mention of Plaintiff's race. *Id*.

To survive summary judgment, Plaintiff must, at the very least, point to *some* evidence in the record that demonstrates the existence of a genuine issue of material fact that might provide *some* basis for a reasonable jury to doubt Defendants' explanation. But Plaintiff points to no admissible evidence that contradicts the evidence that Defendants' decision makers had no knowledge of

44

Plaintiff's race.  In fact, the evidence Plaintiff points to actually supports

Defendants' position.  For example, he argues that it would be "incompetent" for

Defendants to close an account without contacting local bank personnel or pulling

up his account information, pointing to Exhibit 6, an internal "Customer Summary"

of his account records.  Doc. #53 at 7; Doc. #42-2.  Plaintiff believes that because

this document provides an explanation of why he moved his money to Defendants'

bank, that "local information was readily available" to the officials who closed his

account.  Doc. #53 at 7.  Presumably, Plaintiff believes that such "local

information" includes his race.  However, although the "Customer Summary"

contains personal information, such as his driver's license number and Social

Security number, it does not mention Plaintiff's race.  Plaintiff does not explain

how this document could provide any information to decision makers other than

what is on the face of it.  The "Customer Summary" does not create an issue of

fact as to whether any decision maker knew Plaintiff's race.  The document

instead supports Defendants' position, because it is yet another document that

decision makers accessed or created that contains no reference to Plaintiff's race.

Plaintiff also argues that because Lumpkin testified that Fayah Nyumah had

access to his banking and investment accounts, the "Court must conclude that the

investigators had access to all accounts' information as well."  Doc. #53 at 7.

This argument also assumes that Plaintiff's account information contained

information about his race.  Again, Plaintiff points to no account record of

Defendants that mentions his race.  There is no evidence that the fact was ever

45

recorded by Defendants, and the affidavits of Amelia Gross, Dahlke, Mangan, and Massa state that neither Chase nor CISC collects such information. Plaintiff points to no evidence to show that Fayah Nyumah had any contact with the non-local decision makers, or any reason to believe that Nyumah's personal knowledge about Plaintiff should be imputed to them. No reasonable jury could make such an inference based on the fact that one local bank employee had access to both Plaintiff's banking and investment accounts, none of which bear any indication of his race.

Plaintiff further argues that racial animus could be inferred from the fact that two groups of Defendants' employees came to different conclusions about the risk of having Plaintiff as a customer. Doc. #53 at 9. Plaintiff points out that Williams and Lumpkin, who are both African-American, decided to open his accounts, while another group of Defendants' employees decided to close his accounts. *Id.* In support of this argument, Plaintiff cites *Tinker v. Sears, Roebuck, & Co.*, 127 F.3d 519 (6th Cir. 1997) for the proposition that a court "must deny summary judgment" summary where a defendant's employees "disagree" with its position. *Id.* However, *Tinker* was an age discrimination case in which three different employees provided three different reasons for the employee's termination, creating a genuine issue of material fact as to the actual reason for the termination. 127 F.3d at 523. The *Tinker* contradiction arose because of the conflicting reasons offered for a single decision, but Defendants' employees herein have not provided contradictory reasons for the decision to close Plaintiff's

46

accounts. Nor has Plaintiff pointed to any evidence that there was any internal disagreement about the decision to close his accounts. Instead, each piece of undisputed evidence before the Court, whether an affidavit, internal report, or an email, states the same reason for closing Plaintiff's accounts.

In conclusion, Defendants have shown that there is undisputed, admissible evidence that the employees who decided to close Plaintiff's accounts had no knowledge of his race. On behalf of CISC, Dahlke made the decision to close Plaintiff's investment account, and Mangan made the decision on behalf of Chase to close the checking and savings accounts. Doc. #24-4 at 2; Doc. #24-5 at 2. In response, Plaintiff has not identified any admissible evidence presenting a genuine issue of fact for a jury to resolve. No reasonable jury could conclude that racial animus motivated Defendants' decision to close Plaintiff's accounts, because the undisputed facts show that the persons who decided to close his accounts had no knowledge of his race. The Court concludes, therefore, that Defendants are entitled to judgment as a matter of law on Plaintiff's Section 1981 discrimination claim (Count One).[8]

---

[8] Defendant Cox is also entitled to judgment as a matter of law on the discrimination claim. Although Defendants do not specifically address Cox in their arguments, the undisputed evidence shows that he was not involved in the decision to close Plaintiff's accounts and that race played no factor in his initial inability to refund the funds in the frozen investment account. Doc. #24-3. Plaintiff points to nothing that disputes those facts. Furthermore, no reasonable jury could conclude that Cox's interruption of the meeting between Plaintiff and Lumpkin amounted to racial discrimination in the making or performance of a contract for services. No other action by Cox appears even tangentially related to Plaintiff's racial discrimination claim, in spite of Plaintiff's conclusory and general

C. **Securities Fraud under 15 U.S.C. § 78j(b) (Count Two)**

Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device" that violates any rule or regulation promulgated by the SEC to protect investors. 15 U.S.C. § 78j(b). The primary purpose of federal securities legislation is "to eliminate serious abuses in a largely unregulated securities market." *United Housing Found., Inc. v. Forman,* 421 U.S. 837, 849 (1975). Section 10(b) is implemented by SEC Rule 10b-5, which states that it is:

> unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> > (a) To employ any device, scheme, or artifice to defraud,
> >
> > (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the

---

allegations of such discrimination by "Defendant(s)" in Count Two of his Complaint. Doc. #1 at 2. (The undisputed evidence also shows that there is no basis for the allegation that Cox removed Lumpkin as the manager from Plaintiff's investment account, as discussed *infra* Part IV.C.) Plaintiff has been on notice since Defendants first filed for summary judgment on July 26, 2012, of their challenge to his claims against Cox. He has had ample opportunity through discovery to pursue evidence supporting his claims and to defend them in multiple responses to Defendants' arguments, but has not sought leave to amend or otherwise support any claim against Cox. Based on the undisputed evidence before the Court, no reasonable jury could find Cox liable under Section 1981. Furthermore, Plaintiff did not list Cox as a defendant in the caption of his Amended Complaint. Doc. #46. Although once referenced therein as a defendant, Plaintiff merely repeated the same conclusory allegations made against Cox in the original Complaint. Plaintiff's failure to develop any argument against Cox leads the Court to conclude that any claims against him have been abandoned.

> > light of the circumstances under which they were made, not
> > misleading, or
>
> > (c) To engage in any act, practice, or course of business which operates
> > or would operate as a fraud or deceit upon any person,
>
> in connection with the purchase or sale of any security.

17 C.F.R. § 240.10-b. The Supreme Court has long recognized a private plaintiff's
"right of action implied in the words of the statute and its implementing
regulation." *Stoneridge Inv. Partners, LLC v. Scientific Atlanta*, 552 U.S. 148, 157
(2008) (citing *Superintendent of Ins. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 13
n.9 (1971)). The elements of a Section 10(b) claim are: "(1) a material
misrepresentation or omission by the defendant; (2) scienter; (3) a connection
between the misrepresentation or omission and the purchase or sale of a security;
(4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss
causation." *Id*.

Plaintiff alleges that Defendants violated Section 10(b) by closing his
investment account and failing to return the funds within it. Doc. #1 at 5. He also
alleges that he relied upon the representation that Lumpkin would "remain the
agent on the account," and that "the management of the investment account
would be conducted in an honest, honorable, and legal manner." *Id.* at 3.

Defendants argue that Plaintiff's claim must fail because the account closure
and the allegation that Defendants failed to return Plaintiff's money are "non-
securities matters" that cannot form the basis for a securities fraud claim under

Section 10(b).[9]  Doc. #24 at 13.  Defendants also argue that Plaintiff's allegation that he was induced to open the account based on assurances that Lumpkin would remain the account advisor cannot support a Section 10(b) claim because a statement that induces a plaintiff to open an account is not made "in connection with" a specific security under the statute.  *Id.* at 14.  Even if those assurances could form the basis for such a claim, Defendants point out that they were not false, as Cox's affidavit states that Lumpkin was never removed as the advisor on Plaintiff's account.  *Id.*

In response, Plaintiff argues that Defendants offer an unreasonably limited interpretation of the scope of a Section 10(b) claim, and likens the "falsehood" of which he complains to a situation in which a defendant lies about his expertise and experience as a securities purchaser in order to obtain new clients.  Doc. #53 at 10.  Plaintiff believes that the statement upon which he relied is "well within" the scope of a cognizable Section 10(b) claim.  *Id.*

Even if Plaintiff's expansive interpretation of Section 10(b) were correct, Defendants are entitled to judgment as a matter of law because they have pointed to undisputed evidence that no misrepresentation was made to Plaintiff.  Cox's affidavit states that he was Lumpkin's supervisor and that "Mr. Lumpkin remained as Mr. Wheat's advisor at all times the account was open."  Doc. #24-3 ¶¶ 3, 5.

---

[9] Defendants also argue also that Plaintiff's Section 10(b) claim fails because he failed to name CISC as a defendant.  Doc. #24 at 13.  That argument is no longer viable because the Court granted Plaintiff leave to amend the Complaint to name CISC as a defendant, which he has done.  Doc. #46.

In his Response, Plaintiff points to no evidence to the contrary. In fact, he does not even mention Cox's affidavit. The statement that Lumpkin was never removed from Plaintiff's account is, therefore, undisputed. Because the undisputed evidence shows that Lumpkin was never removed from Plaintiff's account, no reasonable jury could conclude that Defendants' employees made a misrepresentation to Plaintiff when they assured him that Lumpkin would manage his account. Because no reasonable jury could conclude that a misrepresentation occurred, Defendants are entitled judgment as a matter of law on Plaintiff's Section 10(b) claim. Whether the inducement to which Plaintiff refers can even form the basis for a cognizable claim under Section 10(b) is a highly arguable proposition, but it is an issue the Court need not reach.[10]

Without any misrepresentation that might amount to fraud or deception, the closure of Plaintiff's account and the alleged failure to return his money cannot form the basis for a Section 10(b) claim. The Supreme Court has cautioned that "a private cause of action under the antifraud provisions of the Securities Exchange Act should not be implied where it is 'unnecessary to ensure the fulfillment of

---

[10] Defendants argue that any alleged misrepresentation that Plaintiff claims induced him to open the account is not actionable under Section 10(b), citing *Bischoff v. G.K. Scott & Co.*, Inc., 687 F. Supp. 746 (E.D.N.Y. 1986). The *Bischoff* court reasoned that "[b]ecause such broker misrepresentations are connected to the broker's efforts to attract the investor's business, and are not tied to a particular trade, they do not meet the Rule 10b–5 requirement that an actionable misrepresentation be in connection with the purchase or sale of securities." *Id.* at 749. Here, Plaintiff's failure to counter the undisputed fact that no misrepresentation occurred makes it unnecessary to resolve whether such inducements are, in fact, actionable under Section 10(b).

Congress' purposes' in adopting that Act." *Santa Fe Indus., Inc. v. Green*, 430

U.S. 462, 477 (1977) (quoting *Piper v. Chris-Craft Indus.*, 430 U.S. 1, 41 (1977)).

In *Santa Fe*, the Supreme Court held that a claim based on "corporate

mismanagement . . . in which the essence of the complaint is that shareholders

were treated unfairly by a fiduciary" could not form the basis for a Section 10(b)

claim because the defendants' actions were neither deceptive nor manipulative, as

the statute was enacted to prevent, and an applicable state law remedy existed.

*Id.* at 477; *see also Capital Mgmt. Select Fund Ltd. v. Bennett*, 680 F.3d 214, 225

(2nd Cir. 2012) (stating that "[b]reaches of contract generally fall outside the

scope of the securities laws" unless a defendant makes contractual promises with

the intention of never fulfilling them). Without some demonstration of a genuine

issue of material fact, from which a reasonable jury might conclude that a

deceptive or manipulative act occurred, a Section 10(b) claim cannot exist. State

law remedies for breach of contract and conversion may apply to Plaintiff's claims,

but Section 10(b) does not.

Based on the foregoing, the Court concludes that no genuine issue of

material fact exists, and that Defendants are entitled to judgment as a matter of

law. Therefore, summary judgment is granted on Plaintiff's claim under Section

10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (Count Two).

### D. Breach of Contract (Count Three)

Plaintiff has also brought a common law state claim for breach of contract, in which he alleges that Defendants breached their contractual obligations to him by closing his accounts and failing to return his funds. Under Ohio law, the elements of a breach of contract claim "include the existence of a contract, performance by the plaintiff, breach by the defendant, and damage or loss to the plaintiff." *Doner v. Snapp*, 649 N.E.2d 42, 44 (Ohio Ct. App. 1994). A plaintiff may demonstrate the element of breach by showing that the defendant failed, without legal excuse, to fulfill a contractual obligation. *Spectrum Benefit Options, Inc. v. Med. Mut. of Ohio*, 880 N.E.2d 926, 934 (Ohio Ct. App. 2007).

Defendants present several arguments to support their position that they are entitled to summary judgment on Plaintiff's breach of contract claim. First, Defendants point out that the contracts governing the Chase and CISC accounts gave those entities the right to restrict or close the accounts at any time, precluding any breach of contract claim based on such closure. Doc. #24 at 15-16. Second, Defendants argue that there is undisputed evidence that all of Plaintiffs' funds were returned to him. *Id*. at 16. Third, Defendants argue that Plaintiff cannot argue breach of contract based on any representation or promise that Lumpkin made to Plaintiff that was not reflected in the CISC Service Agreement, because the agreement was an integrated document subject to the parol evidence rule. *Id.* at 16-17.

Plaintiff responds by arguing that that an illegal or unconstitutional reason for breach, such as race discrimination, cannot be authorized under the contractual provision giving the Defendants the right to terminate or restrict the accounts for any reason. Doc. #41 at 29. He also argues that Defendants failed to give him "any notice" before closing his investment account, but does not address the Defendants' other arguments in either his original or supplemental Memoranda in Response. *Id.* at 30; Doc. #53.

Here, Defendants have pointed to undisputed evidence that the contracts governing Plaintiff's accounts gave Defendants the right to close them for any reason. Plaintiff's checking and savings accounts were governed by the "Account Rules and Regulations," which state that "[e]ither you or the Bank may close your Account at any time with or without cause." Doc. #24-2 at 25. Plaintiff signed an acknowledgment that he received the "Account Rules and Regulations," agreeing to be bound by its terms. *Id.* 3-4. Plaintiff admits signing the agreement. Doc. #1 at 2.

Plaintiff's investment account granted both parties the same rights. The "Brokerage Agreement" gave CISC or Plaintiff the right to terminate or restrict the account "at any time and for any reason, upon notice," as well as the right to "freeze" the account, without notice, if either CISC or its Clearing Broker considered themselves "at risk for any reason" regarding the account. Doc. #24-7 at 16. Plaintiff signed a "Client Services Agreement" in which he agreed to be bound by the terms of the Brokerage Agreement. *Id.* at 6.

Thus, the undisputed evidence shows that Defendants were exercising rights that the contracts explicitly granted to them when they closed Plaintiff's checking and savings accounts and froze his investment account.  Because the Court granted summary judgment to Defendants on Plaintiff's Section 1981 claim, there is no basis for him to argue that those actions were illegal.  Plaintiff has pointed to no evidence to demonstrate a genuine dispute over the fact that Defendants acted in accordance with their contractual right to close his accounts.  Because the closures were explicitly authorized by the contracts, no reasonable jury could conclude that Defendants breached the contracts by terminating his accounts.

Although Plaintiff does not contest Defendants' argument that they were not contractually obligated to perform any promise made by Lumpkin that was not integrated into the Brokerage Agreement, the Court notes that the undisputed evidence shows that Lumpkin's promise to him was, in fact, fulfilled.  Plaintiff alleges that he opened his investment account because Lumpkin promised him that he would manage the account.  Doc. #1 at 3. As mentioned in the Court's discussion of Plaintiff's securities fraud claim, Plaintiff does not contest Cox's statement that, as Lumpkin's supervisor, he never removed Lumpkin as the manager of Plaintiff's investment account. *See infra* Part IV.C.; Doc. #24-3 ¶¶ 3, 5.  Thus, even if Lumpkin's promise could be considered a possible basis for a breach of contract claim, the undisputed evidence shows that the promise was fulfilled.

Finally, although Plaintiff does not address the argument, the Court does not agree with Defendants that Cox's affidavit unequivocally shows that all of the funds in Plaintiff's investment account were returned to him.  The Cox declaration states that CISC issued Plaintiff a check for $150,000, "the amount Mr. Wheat initially invested."  Doc. #24-3 at 2.  However, Plaintiff's affidavit states that his account had earned over $3,000 in returns by the time it was closed, and that amount was not returned.  Defendants' internal "Customer Summary" corroborates Plaintiff's assertion that some amount of funds was unreturned to him.  The document appears to be dated August 31, 2011, and states that the "current balance" of the investment account on that date was $154,026.53.  Doc. #42-2. The evidence Defendants point to does not account for the additional $4,026.53. There is, therefore, a genuine issue of material fact as to whether Plaintiff received all of the money in the account to which he was entitled, as well as to the amount of that money.  As Defendants point out, CISC was merely the custodian of the assets in Plaintiff's account.  Doc. #25 at 15; Doc. #24-7 at 5.  If CISC retained some portion of Plaintiff's money, such action might constitute a breach of the parties' agreement.  The Court must, therefore, overrule Defendants' motion for summary judgment on Plaintiff's breach of contract claim with regards to CISC.

However, there is no genuine issue of fact as to whether Plaintiff received the entirety of the funds in his checking and savings accounts at Chase.  Plaintiff's Complaint states that he himself went to Chase "to withdraw all of his funds," and alleges that he was not allowed to withdraw funds from only his CISC investment

56

account.  He does not allege that he did not receive the money in his Chase

checking or savings accounts.  Furthermore, Plaintiff does not allege or point to

any evidence to show that Cox retained the proceeds from his investment account.

Thus, Plaintiff has not demonstrated that a genuine issue of material fact exists

under any possible theory of breach with regards to Defendants Chase or Cox.

Accordingly, the Court grants summary judgment to Chase and Cox on Plaintiff's

breach of contract claim (Fourth Cause of Action), but, as stated, overrules

Defendants' motion with regards to Defendant CISC on Plaintiff's breach of

contract claim.

### E.    Conversion (Count Four)

Plaintiff has also brought a claim for conversion under state law, alleging

that Defendants' refusal to return the funds in his investment account amounted to

conversion.  Ohio recognizes the common law tort of conversion and defines it as

"the wrongful exercise of dominion over property to the exclusion of the rights of

the owner, or withholding it from his possession under a claim inconsistent with

his rights."  *Joyce v. Gen. Motors Corp.*, 551 N.E.2d 172, 175 (Ohio 1990).  The

elements of conversion claim are "(1) plaintiff's ownership or right to possession of

the property at the time of the conversion; (2) defendant's conversion by a

wrongful act or disposition of plaintiff's property rights; and (3) damages."  *Dice v.*

*White Family Cos., Inc.*, 878 N.E.2d 1105, 1109 (Ohio Ct. App. 2007) (citations

omitted).  "If a defendant comes into possession of property lawfully, a plaintiff

must prove two additional elements: (1) that she demanded the return of the property after the defendant exercised dominion or control over the property and (2) that the defendant refused to deliver the property to the plaintiff." *Jarupan v. Hanna*, 878 N.E.2d 66, 72 (Ohio Ct. App. 2007). If the allegedly converted property is cash, the plaintiff must also show that the funds are specifically identifiable and that the defendant had an obligation to return them. *Dice*, 878 N.E.2d at 1109.

Defendants argue that they are entitled to summary judgment on Plaintiff's conversion claim because they never exercised dominion over the money in his investment account in a manner that would constitute conversion, as the $150,000 was returned to Plaintiff. Doc. #24 at 15-16. They also point to the language of the investment agreement that expressly states that Plaintiff is the owner of the funds in his account and CISC acts only as the custodian of Plaintiff's funds. *Id.*

Plaintiff responds by arguing that Defendants converted his funds when they refused to give him the balance of his investment account the day that he demanded its return, even though he later received a check for $150,000. Doc. #41 at 30. Plaintiff also argues that his account had earned $3,166 in proceeds in

58

addition to the initial deposit amount by the time it was closed that he has never received.[11] *Id.*

Defendants Chase and Cox entitled to summary judgment on Plaintiff's conversion claim. The undisputed evidence shows that CISC, and not Chase or Cox, was the custodian of Plaintiff's investment account. Thus, neither Chase nor Cox exercised dominion or control over the funds in question. No reasonable jury could find either party liable for conversion without having had possession of Plaintiff's funds.

However, there are two reasons why the Court cannot grant summary judgment to CISC on Plaintiff's conversion claim. First, it is unclear for how long CISC apparently continued to exercise control over Plaintiff's investment account after he demanded the return of his funds. It is certain that by August 30, 2011, Defendants had issued a check to Plaintiff for $150,000, the amount of his initial deposit. Based on Cox's affidavit, Plaintiff appears to have demanded the return of the funds in his investment account on August 12, 2011. Doc. #24-3 at 2. Thus, some eighteen days passed between Plaintiff's demand and the return of his funds. According to Cox's affidavit, the delay was attributable to "a process to reverse purchases and trades made in the account" so that Plaintiff's money could

---

[11] Plaintiff does not explain how he determined that the account earned $3,166 in proceeds. The statement provided to the Court shows that the investment account had a balance of $154,026.53 on August 31, 2011, reflecting in excess of more than four thousand dollars over Plaintiff's original deposit. Doc. #42-2. Thus, as discussed in the Court's analysis of the breach of contract claim, there is a genuine issue of material fact as to the amount of return Plaintiff's account had earned before it was closed.

59

be returned "without creating a taxable event." Doc. #24-3 at 2. Cox's statement
is too opaque to explain why CISC continued to hold onto Plaintiff's funds for
weeks after his demand. The explanation is particularly unsatisfactory when
considered in light of the express term of the Client Services Agreement that
states that "[i]f a portion of the entire Account is to be liquidated as a result of
termination, CISC may take *up to* five (5) trading days to effect such liquidation."
Doc. #24-7 at 7 (emphasis added). Furthermore, the internal report that Plaintiff
attached to his Response, which details the investigation of Plaintiff, states that
his investment account was closed on May 11, 2011, three months before Plaintiff
arrived at the bank to demand his funds. Doc. #42-7 at 4. Thus, genuine issues
of material fact exist regarding Defendants' possession of Plaintiffs funds. After
considering them, a reasonable jury might conclude that the funds were held
wrongfully after Plaintiff's demand.

The second reason that the Court cannot grant summary judgment to CISC
on Plaintiff's conversion claim is that Defendants have not addressed the entire
amount of the allegedly converted funds. Their arguments for summary judgment
and the evidence they cite only address the $150,000 amount of Plaintiff's original
deposit. However, Plaintiff's affidavit states that his account had earned over
$3,000 in returns by the time it was closed, and that amount was not returned.
As discussed previously, that assertion is bolstered by the information on
Defendants' internal "Customer Summary," which indicates that the "current
balance" of Plaintiff's investment account was $154,026.53 on August 31, 2011,

60

although the exact amount of earnings is unclear. Doc. #42-2. Furthermore, that document also states that the account was "active." *Id.* The date, balance, and status of the account are perplexing, in light of Cox's averment that the "process" for reversing trades that resulted in a refund of Plaintiff's exact deposit occurred during the weeks before August 30, 2011. Defendants have not addressed the entirety of the amount allegedly converted. The facts surrounding CISC's possession of Plaintiff's funds and the exact amount of the allegedly converted funds are genuinely in dispute. CISC is not, therefore, entitled to summary judgment on Plaintiff's conversion claim. *See, e.g.*, *Bosio v. Norbay Sec., Inc.*, 599 F. Supp. 1563, 1571 (D.C.N.Y. 1985) (holding that plaintiff successfully pled a claim for conversion where brokerage refused to provide plaintiff with proceeds from sale of securities in his account).

## F.    Intentional Infliction of Emotional Distress (Count Five)

Plaintiff's fifth cause of action alleges that "Defendant[s'] actions have caused Plaintiff to suffer embarrassment, emotional distress, and substantial financial loss," which the Court construes as a claim for intentional infliction of emotional distress ("IIED"). Doc. #1 at 4. An IIED claim imposes liability on "[o]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another ... for such emotional distress, and[,] if bodily harm to the other results from it, for such bodily harm." *Yeager v. Local Union 20, Teamsters, Chauffers, Warehousemen & Helpers of Am.,* 453 N.E.2d 666, 671

61

(Ohio 1983) (quoting Restatement (Second) of Torts § 46 (1965)), *abrogated on other grounds by Welling v. Weinfeld*, 866 N.E.2d 1051 (Ohio 2007). A defendant is only liable if its "conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* Ohio courts have emphasized that "major outrage is essential to the tort, and the mere fact that the actor knows that the other will regard the conduct as insulting, or will have his feelings hurt, is not enough." *Strausbaugh v. Ohio Dep't. of Transp.*, 782 N.E.2d 92, 96 (Ohio Ct. App. 2002) (citing *Garrison v. Bobbitt*, 731 N.E.2d 216, 220-21 (Ohio Ct. App. 1999)). "Only conduct that is truly outrageous, intolerable, and beyond the bounds of decency is actionable; persons are expected to be hardened to a considerable degree of inconsiderate, annoying, and insulting behavior." *Id.*

Defendants argue that their conduct, which they characterize as the exercise of their contractual rights, does not qualify as the type of outrageous conduct condemned by the tort of IIED. Doc. #24 at 18. They compare the termination of Plaintiff's accounts to case law holding that the lawful termination of an employee cannot support an IIED claim. *Id.* (citing *Bratton v. Lima Commc'n Corp.*, No. 3:03CV7752, 2004 WL 1618834 (N.D.Ohio July 16, 2004)). Embarrassment, mental anguish, and emotional distress might be the inevitable and unfortunate effects of such actions, but, being lawful, Defendants argue that they do not amount to extreme, atrocious, or outrageous conduct. *Id.*

62

In response, Plaintiff states that he was "devastated and humiliated" by Defendants' actions, and refers generally to his affidavit. Doc. #41 at 32. Therein, Plaintiff describes the following conduct of Defendants: Chase sent him a letter informing him of the termination of his checking and savings accounts; Williams did not return Plaintiff's phone calls; Defendants refused to return the money in his investment account the day that he went to close out the checking and savings accounts; and Defendants eventually refunded his $150,000 deposit, but without the proceeds from the investments. *Id.* at 37-39. According to Plaintiff, Defendants' act of keeping those proceeds caused him "embarrassment," and states that "Defendants' treatment of me hurt terribly. It offended me and affected me emotionally and physically." *Id.* at 39. He describes being hospitalized for a stroke and a heart attack, although he does not claim that Defendants' actions were the proximate cause of those health problems. *Id.* Plaintiff also states that he was embarrassed because the closure of his accounts became public knowledge, and complains that he was not provided with "respect" or the "common courtesy" of being contacted before deciding to close his accounts. *Id*.

Based on the undisputed evidence cited by both parties, no reasonable jury could conclude that Defendants' conduct was outrageous, atrocious, or intolerable to a civilized society. As Defendants suggest, the agreements governing the accounts that the parties entered into explicitly gave them, as well as Plaintiff, the right to close Plaintiff's accounts at any time, and for any reason. Their exercise

63

of that right, although unwelcome to Plaintiff, was not indicative of conduct intolerable to a civilized society. Rather, it was a foreseeable contingency to which Plaintiff assented when he opened his accounts. There is no indication that Plaintiff, a local businessman of repute and sophistication, entered into anything other than an arms-length transaction with Defendants when he signed the account agreements.

Furthermore, no reasonable jury could conclude that the specific actions of Defendants described in Plaintiff's affidavit amount to outrageous conduct that might support an IIED claim. Sending Plaintiff a letter informing him of the account closures, refusing to return his money or his phone calls, and not consulting him before deciding to close his accounts do not amount to atrocious, uncivilized conduct. *See, e.g.*, *Baghani v. Charter One Bank*, 2009-Ohio-490, 2009 WL 280399 (Ohio Ct. App. 2009) (affirming summary judgment granted in favor of bank that removed plaintiff from home equity line of credit and informed her that her husband requested her removal, as bank's actions did not amount to "behavior so extreme as to go beyond all possible bounds of decency").

In addition, any assurance that Plaintiff relied upon regarding Lumpkin's ongoing role as account manager does not amount to actionable conduct. As discussed previously, Lumpkin remained the account manager at all times the account was open. Even if he had been removed, however, that action would not have amounted to extreme or outrageous conduct. *See, e.g.*, *Provident Bank v. Adriatic, Inc.*, 2005-Ohio-5774, 2005 WL 2840741 (Ohio Ct. App. 2005)

(rejecting, as conduct that might support an IIED claim, a bank's reduction in line of credit from $750,000 to $500,000 after creditors claimed that they had relied on bank's alleged promise not to reduce credit line and reduction harmed their business). No reasonable jury would characterize any of Defendants' actions as "extreme and outrageous." Plaintiff may have been insulted by Defendants' actions, but insulting conduct does not create a genuine issue of material fact on an IIED claim. *Strausbaugh*, 782 N.E.2d at 96.

Finally, the emotional distress that Plaintiff describes lacks the substance or severity required of an IIED claim. The Ohio Supreme Court has held that "the emotional distress alleged must be serious." *Yeager*, 453 N.E.2d at 671. Such distress must be "severe and debilitating to a reasonable person." *Meyers v. Hot Bagels Factory, Inc.*, 721 N.E.2d 1068, 1076 (Ohio Ct. App. 1999). Serious emotional distress is more than "trifling mental disturbance, mere upset or hurt feelings." *Katterhenrich v. Fed. Hocking Local School Dist. Bd. of Edn.*, 700 N.E.2d 626, 633 (Ohio Ct. App. 1997) (quoting *Paugh v. Hanks*, 453 N.E.2d 759, 765 (Ohio 1983)). Rather, it encompasses psychic injury with which no reasonable person might cope, such as "traumatically induced neurosis, psychosis, chronic depression, or phobia." *Id.* No reasonable jury could find that the embarrassment, humiliation, and devastation of which Plaintiff complains amount to severe emotional distress under Ohio law. *See, e.g., Katterhenrich*, 700 N.E.2d at 633-34 (rejecting "humiliation, serious emotional distress and loss of self-esteem" as "emotional distress of the magnitude necessary to sustain a viable

65

claim for intentional infliction of emotional distress" where plaintiff's sole assertion

of psychological treatment for "stress" was made in affidavit responding to

summary judgment); *Jackson v. City of Wooster Bd. of Educ.*, 504 N.E.2d 1144,

1147 (Ohio Ct. App. 1985) (affirming trial court's finding that an eighth grade

student whose gym teacher forced him to perform 25 push-ups while naked for

taking a second towel after showering suffered no serious emotional distress,

where student only saw therapist twice for "depression" after humiliating incident).

Furthermore, "[a] plaintiff claiming serious emotional distress must present some

'guarantee of genuineness' in support of his claim to prevent summary judgment in

favor of the defendant." *Ford Motor Credit Co. v. Ryan*, 939 N.E.2d 891, 914

(Ohio Ct. App. 2010) (citing and quoting *Paugh*, 451 N.E.2d at 764 and *Powell v.*

*Grant Med. Ctr.*, 771 N.E.2d 874 (2002)).  Expert medical testimony or even

affidavits from "lay witnesses who 'testify as to any marked changes in the

emotional or habitual makeup that they discern in the plaintiff'" may suffice. *Id.*

Here, Plaintiff does not describe any medical treatment that he underwent for his

emotional distress or offer any independent testimony to verify how Defendants'

behavior affected him.  Furthermore, his own description of his embarrassment,

humiliation, and hurt feelings falls short of the suffering that, under Ohio law, a

victim of severe emotional distress must endure.

　　　　Based on the foregoing, the Court concludes that no reasonable jury could

find that Defendants' conduct, based on the evidence cited by Plaintiff, was

extreme, outrageous, or atrocious, or that Plaintiff suffered emotional distress of

the severity required to support an IIED claim. Accordingly, the Court grants summary judgment to all Defendants on the claim for "emotional distress" in Count Five of Plaintiff's Complaint, construed as an Ohio common law claim for intentional infliction of emotional distress.

### G. Plaintiff's Surviving State Law Claims against CISC

Plaintiff invoked the Court's supplemental jurisdiction under 28 U.S.C. § 1367 to bring his state law claims for breach of contract, conversion, and intentional infliction of emotional distress. Under 28 U.S.C. § 1367(c)(3), a district court "may decline to exercise supplemental jurisdiction" over state law claims if it "has dismissed all claims over which it has original jurisdiction" in the action. The statute provides "explicit" permission for a district court to decline an exercise of supplemental jurisdiction after granting summary judgment to a defendant on a plaintiff's federal claims. *Weeks v. Portage Cty. Exec. Offices*, 235 F.3d 275, 279-80 (6th Cir. 2000); *see also United Mine Workers of Am. v. Gibbs*, 383 U.S. 715 (1966) (observing that "[c]ertainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well"). Because the Court has granted summary judgment in favor of all Defendants on both of Plaintiff's federal claims, it will decline to continue to exercise jurisdiction over his state law claims that survived summary judgment. Said claims entirely involve the application of state law, and, as such, should be heard in Ohio courts. Moreover, having already completed discovery and

formulated their arguments with respect to said claims, the parties will bear little burden litigating those claims if Plaintiff chooses to file them in state court. The Court, therefore, DISMISSES WITHOUT PREJUDICE to refiling in a state court of competent jurisdiction Plaintiff's breach of contract claim (Count Three) and conversion claim (Count Four) against CISC.

## V. DEFENDANTS' MOTIONS *IN LIMINE* (DOC. #62, DOC. #63, DOC. #64, DOC. #65, AND DOC. #66)

In anticipation of trial, Defendant filed five Motions *in Limine* under Fed. R. Evid. 401, 402, and 403, on December 24, 2013, at Doc. #62, Doc. #63, Doc. #64, Doc. #65, and Doc. #66. The Court's summary judgment rulings have precluded a trial on any of Plaintiff's claims. Defendants' Motions *in Limine* are, therefore, OVERRULED AS MOOT.

## VI. CONCLUSION

For the reasons set forth above, the Court rules as follows:

The Court STRIKES, under Fed. R. Civ. P. 12(f)(1), all amendments Plaintiff made to the Amended Complaint (Doc. #46), with the exception of the naming of CISC as a defendant.

The Court OVERRULES Plaintiff's Request to Reopen Discovery (Doc. #53), construed as a Motion for Additional Discovery under Fed. R. Civ. P. 56(d).

The Court SUSTAINS in part and OVERRULES in part Defendants' Motion for Summary Judgment (Doc. #24).

The Court GRANTS summary judgment in favor of all Defendants on Plaintiff's federal claims arising under 42 U.S.C. § 1981 (Count One) and 15 U.S.C. § 78j(b) (Count Two), and Plaintiff's state law claim for  intentional infliction of emotional distress (Count Five).  Defendants Chase and Cox are granted summary judgment on all of Plaintiff's claims against them.

Genuine issues of material fact preclude granting summary judgment to CISC on Plaintiff's state law claims for breach of contract (Count Three) and conversion (Count Four).  Defendants' motion is, therefore, overruled with respect to said claims against CISC.

In the absence of any viable federal claims against CISC, however, the Court declines to exercise supplemental jurisdiction over Plaintiff's surviving state law claims for breach of contract and conversion, as authorized by 28 U.S.C. § 1367(c)(3).  The Court, therefore, DISMISSES WITHOUT PREJUDICE to refiling in a state court of competent jurisdiction Plaintiff's state law claims against CISC for breach of contract (Count Three) and conversion (Count Four).

Finally, the Court OVERRULES AS MOOT the Motions *in Limine* (Doc. #62, Doc. #63, Doc. #64, Doc. #65, and Doc. #66) filed by Defendants on December 24, 2013.

Judgment will be entered in favor of Defendants and against Plaintiff on Count One and Count Two, the sole federal claims against them, and on the state

law claim of intentional infliction of emotional distress (Count Five). Count Three (breach of contract) and Count Four (conversion) against CISC are dismissed without prejudice to refiling in a state court of competent jurisdiction.

The captioned case is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.

Date: February 3, 2014

WALTER H. RICE
UNITED STATES DISTRICT JUDGE

70